Good morning, Your Honors. May it please the Court, my name is Deborah Archer, and I represent the Plaintiff's Appellants in this case. As this Court has previously held, it will be the unusual Section 2 case in which the Plaintiff can establish the three jingles, preconditions, preconditions, but still fail to demonstrate vote dilution under the totality of the circumstances. This is certainly not one of those unusual cases. Not only did the District Court find and the defendants concede that the Plaintiffs established the three jingles, preconditions, but the District Court also found that the Plaintiffs established the two predominant Senate factors, the existence of highly racially polarized voting, and that no black City Council candidate has ever been elected in the challenged wards. Hattiesburg chose a City Council ward plan that was the least proportional of several available options, rather than adopt a ward plan that reflected the changing demographics of the City of Hattiesburg, which is now a majority black City. Weren't there problems with the other proposals? There was the one proposal that even Councilman Naylor opposed because it would carve up districts too much, and then there was Naylor's plan that would carve up the University of Mississippi area, which is sort of a considered kind of its own group. And so, I'm just, I realize there's always another plan, but if the idea in redistricting is also to try to keep groups of interest together, you know, not have river, go across the river and go, you know, try to keep sort of geographic and groups of interest together, then are these other two plans really viable? And one of them, as I said, Councilman Naylor didn't even support. Your Honor, there are several responses to your question. Yes, there were several other plans under consideration, both in front of the City Council, and also at trial, the plaintiffs did present several illustrative plans. First, the court, of course, is not limited to any of those plans in devising a remedy. So, if the court found that there was a Section 2 violation, at that stage, there would have been an opportunity to develop a plan that the parties and the judge thought was appropriate. But also, here, the defendants conceded the jingles factor that an appropriate majority black district could be created. So, we would argue that there were several plans that we thought, we think, respect traditional redistricting principles. Also important here to remember that in order, that it's not only that they plan that was the least proportional out of the available options, the only plan that allowed for the white minority in Hattiesburg to retain 60% of the seats on the City Council. It's also a plan that packs black voters at really high levels into two districts. About 75% voting age population in those two districts in order to create three safe majority white City Council seats. Again, in a city that is plagued with racially polarized voting and that has never elected a black candidate from a majority white City Council district. But they have elected a black candidate from the city itself before the city became majority black. So, I realize that's not the City Council, but the mayor is on the City Council, or is the head of it, if you will, and leads the city. So, while I realize it's exogenous, it's not as exogenous to say voting for President Obama or some very different election. So, how do we analyze that, realizing that we're reviewing a district court, not doing our own evaluation in the first instance? And here we would say the conclusions reached by the district court, the factual conclusions are clearly erroneous. As to the election of the mayor, it is correct that Hattiesburg has a black mayor, and he was first elected in 2001. His election in 2001 and 2005, although at that point black voters were not a majority in the city, in 2001 and 2005, there was a much higher turnout rate for black voters than there was for white voters. And I believe that the combination of the higher black than white voter turnout rate, along with the very low turnout rate, is also, we would argue, that the election of the mayor has limited relevance to whether or not the City Council Ward Plan violates Section 2, and whether or not a black candidate could be elected from a majority white ward. Is that the rub in this case? I'm sorry, I didn't hear you, Your Honor. Is that the rub in this case? What I mean is, it's a bench trial. It looks like much of the trial was stipulated record. I mean, you know, there were three plans and so forth, but it didn't look like, some of these cases we get is tooth and toenail, you know, literally. You know, over the facts, who lives where, blah, blah, blah. And this looks like at least a lot of factual matters were stipulated, too, by both sides, or not heavily contested, maybe is a better way of putting it. So, you get the plans, and of course the fact that it's a factor of the mayor. So, with the standard review being what it is, so is the principal tension, existence of the mayor, you know, elected, is that a factor that ought to weigh more on the scale, ignored, weigh none, whatever. We're looking at the same Senate factors, the district court identified, which is two of the most important, et cetera. So, underneath that, my question is, I take it there's no factual dispute that we should be honing in on. It's really more a case of what one is to do legally with the facts that are in the record. Is that a fair characterization? And I'm not trying to put words in your mouth. I'm just trying to, you know, grab where the rubber meets the road here. Yes, Your Honor. I think it would be accurate to say that the facts are largely not in dispute in this case. And we would argue that even if we take all of the factual findings of the district court, that the district court was still clearly erroneous in finding that the plaintiffs had not established a violation of Section 2 under the totality of the circumstances. A very helpful case is this court's decision in Clark versus Calhoun County, the second time this court heard that case. And in that case, they were very similar factual situation. The plaintiffs had established the Jingles preconditions. The plaintiffs had established racially polarized voting, and that no black candidate had been elected in the challenged districts. Also in that case, the district court found that plaintiffs had failed to establish the socioeconomic factor, because although there were disparities based on race on socioeconomic measures, there was significant black turnout. Also, the district court found that the tenuousness factor, the plaintiffs had failed to establish the tenuous factor, and the plaintiffs had also failed to establish lack of responsiveness. And in that case, the Fifth Circuit said that the district court was clearly erroneous in finding that the plaintiffs had failed to establish vote dilution under Section 2, given that factual pattern. And that's very similar to the case we have here, where it's not in dispute that the Jingles preconditions have been established. The district court found extreme racially polarized voting. Often in many elections, we have 100% of black voters voting for the black candidate and 100% of white voters voting for the white candidate. It was established that no black candidate for city council had ever been elected from a majority white city council district. Although we dispute, in the end, the district court's finding on the socioeconomic factors on responsiveness and tenuousness, even if those factors do not weigh in favor of the plaintiff, there is no basis on which to find that the totality of the circumstances analysis was not met. As to how we count the mayor, the district court found that the election of the mayor had very little probative value in determining whether or not a black candidate could be successful in a black city council, in a majority white city council ward. So we would not count the election of Mayor Dupree very heavily in this analysis. It's very different factors that have led to the election of Mayor Dupree. So let me ask you this. If we are going to make this more of a legal question, and I'm not sure I agree with that rubric, but let's walk with that for a minute. We're going to say the facts are largely undisputed. We're going to make this a legal analysis. At what percentage then, you have only five city council districts, and that makes this a little harder than if we had 100, so someone's going to end up on the short end in a racially polarized voting count, right? So at what percentage of the population do we swing to giving the 60% to the minority group when it was previously in the white group? Unfortunately, there aren't any cases that establish exactly when we've hit proportionality, exactly the right percentage or the right deviation for establishing proportionality. We would argue here that it definitely is not proportional based on the guidance from this court and from the Supreme Court and from other courts. So what we have here... It's fairly close here, though, in terms of the populations. It's not as if it's 75% black or something like that. It's fairly close when we're talking about the voting age population, and so that's what I think the rough proportionality... We can debate what that means, but I think that's what the court's trying to say is it's kind of hard because somebody's going to be on the short end of the 60% if we assume the racially polarized voting that you've asserted. And so here you have, I think it's 47% of the voting age population is black, right? 48.5. 48.5, I'm sorry. And so that's what I think the district court meant by rough proportionality. I think the case might be different, again, assuming this no real fact dispute argument and with all the stipulation and all that, if you had a higher percentage. And so at what point... I mean, if we're going to announce a rule kind of as a matter of law, I want to understand what the rule is so other district courts can understand it and city councils, frankly, can understand it because they're very well aware of these cases as they sit there and try to do these maps. So what is the rule that we would be announcing that you would feel would be appropriate in this kind of five-person city council scenario? And it is a difficult situation. It's going to be the rare case where the proportion of But here there's no basis to justify the minority white population getting 60% of the seats and the majority black population getting 40%. You did mention the relatively small deviance in voting age population. The black voting age population is 48.5% and the white voting age population is 45.98%. But what is even more significant is the difference in total population and blacks are 53.92% of total population in Hattiesburg and whites are 40.48% of total population. So when you focus on total population, the deviation from proportionality becomes far more clear because you have a group that is 40% of the population exercising control over 60% of the seats. It's also important here to recognize, and the district court did not... Is the difference in the voting age versus the just total population the fact there's a lot of children? So, I mean, are they going to grow up to make the voting age population difference? I would imagine that that is the difference is folks who have not yet reached the age of majority. And in DeGrande, the Supreme Court did recognize that there's a dispute as to whether or not when you're looking at proportionality, should you look at voting age population or should you look at total population? And they declined to resolve that dispute. But again... And so if we're going to be looking... I mean, again, we are as a federal court being asked to interfere in a duly elected city council's duly constituted decision. And to do so, we have to do so under some basis, which here is the Voting Rights Act. And so I guess I'm questioning if I'm going to do this as a matter of law, I'm trying to make sure I'm understanding where this matter of law comes. And since we can look at the voting age, or rather the city council in enacting this can look at the voting age, and the voting age numbers are very close, can we really say as a matter of law then that this is the wrong plan? Your Honor, Section 2, the Supreme Court has made clear that Section 2 is about looking at the totality of the circumstances and making sure that minorities in a given area have an equal opportunity to participate in the electoral process and elect candidates of their choice. And I would argue that just looking at that 2% voting age population does not give you enough context to make the determination of whether or not we're providing an equal opportunity. Again, here, it's about a majority as well. Black people are a majority of the population. In Lulac v. Perry, the court there found that the adoption of a plan that prevented the new majority, Latino majority, from exercising political authority just as they were able to become a majority was not allowing them to have equal opportunity to participate in the electoral process. Here, that's exactly what we've seen. Just as black voters, black residents have become a majority in Hattiesburg, we've adopted a plan that doesn't allow them to exercise political participation consistent with their majority status in the community. Thank you. Let me ask you, you've proposed a fifth competitive additional ward, a toss-up ward. Was that presented in any of the plans? Your Honor, no plans showed a fifth competitive ward, but it was discussed by the plaintiff's expert, Dr. Lichtman, that that was a possibility to create a fifth competitive ward as opposed to having a 40-60 split. Right. Okay, thank you. Thank you, Your Honor. I've reserved the rest of my time for rebuttal. Thank you. All right. Thank you. Mr. Scanlon, you're up first. May it please the Court. Good morning, Mr. Chief Judge and Your Honors. My name is John Scanlon. My co-counsel and law partner, Jerry Mills, and I are here this morning on behalf of the City of Hattiesburg. Counsel Opposite just said, and she quoted this Court's opinion in Clark v. Calhoun County, that it's going to be the rare or unusual case where the three chambers of the Supreme Court of Hattiesburg are going to make such a finding. That is exactly what the District Court did in this case. It used this Court's guidance and was very particular in its laying out of the facts. Ms. Archer was addressing simply the proportionality of the seats that are on the City Council, but there is much more to the analysis when the rubric under which this Court is supposed to make its decision is a determination of whether or not the minorities are prevented from participating in the entire political process to the same extent that their non-minority counterparts can. And were there any specific facts, local facts, supporting that other than the statistical argument made by the plaintiff's expert? Yes, Your Honor, there were several facts. For example, voter turnout, which I believe was one of the key issues that this Court recently in Veazey v. Abbott was looking at, and of course this Court found that there was a violation there, and one of the reasons this Court looked at was low voter turnout. Okay. Okay, so Veazey isn't a voter dilution case, though, it's a... You're right, Your Honor, it's not. One person being barred from voting improperly is kind of a different metric than whether we're totality of the circumstances, dealing with five, I mean, somebody's going to end up on the short end of the stick in a town where it's racially polarized voting, right? In a five... Well, we wouldn't necessarily agree that they're on the quote-unquote short end of the stick. Obviously, Veazey was talking about voter ID law in Texas, and so there is that distinction. But to answer Judge Brown's, Clement's question, and try to address yours as well, Judge Haynes, there was expert testimony showing not only that the voter turnout was greater numbers, as a matter of fact, in some elections, twice that of the non-minority voters, and that's expert testimony from the plaintiff's expert. So let me ask you this. Is there any of the three so-called white districts where a greater turnout on the part of the black members of that district could, in fact, yield a person of their choosing? Well, the expert witness for the defendants did testify that he believed that there was a ward where that could be achieved, as he looked at different voting precincts. Under the current plan? Under the current plan. Now, the district court said that had some probative value. It did say that... Which ward is that? Well, it was Ward 1, if memory serves, Your Honor. And the district court also said there was some tenuousness to that, but it said it's not totally without probative value. Okay. So let me ask you this, because this is what's really bothering me, is if we were to send this back, you all have stipulated that you could draw three African-American voting age population wards. That to me is different from answering whether those would be at all in keeping with sort of interests like University of Mississippi, you know, whatever. And I don't, frankly, know very much about Hattiesburg, but I've seen, you know, the word gerrymandering came from the fact that sometimes you draw these kind of crazy things where people from very different parts of town are suddenly being joined and whatever. Is that what would be required to get this third African-American district, or could you do it and still retain the compactness and the geographic interest and the whatever? Does that question make sense? It does make sense. I think I understand it. And Judge Brown-Clement's question to Ms. Archer shortly before she sat down was whether or not a plan was offered that did have a majority-minority district, and it was. Mr. Naylor, one of the city councilmen who's African-American, had requested that such a plan be created. He had several requests, but one of them was that that plan offer a majority-minority ward. And that was offered. That was accomplished. So there were actually three plans that were considered by the city council. The vote for the plan that was adopted was not purely along racial lines, as plaintiffs would suggest. There were three votes for the plan that was adopted. Five ward council, I think the court knows that. Three votes adopted the current ward plan that's in place. There was one vote for the plan that I've just addressed that did have a majority-black ward. And then there was one other vote for what's called the CPAC plan. So there were three plans offered, and one of them did achieve that. And obviously, that is one of the conceded jingles preconditions. We know that the minorities... So what's wrong? Why not impose the... Is that the Naylor plan? Yes, Your Honor. So why not just impose the Naylor plan? And I think Your Honor just touched on it a moment ago. This court recently, I think as early as this year or maybe last year, in Gonzalez v. Harris County, talked about the interest of maintaining communities of interest and traditional boundaries. And of course, it was also citing as authority this court's earlier opinion in the Fairley v. Hattiesburg case from eight years ago. I think this court's aware this case has been here before. The major principle factual change is the population shift. So Mr. Naylor's plan would have, in fact, divided some communities... Excuse me. What I wanted to say was the CPAC plan that was offered would have divided some communities of interest, and that was one of the concerns of Mr. Naylor, which is why he didn't support it. But then his plan also divides a community of interest, right, the University of Mississippi? What's wrong with the Naylor plan? Let me just come at it that way. If you were to say, we're going to just impose what we think is right, what would be wrong with the Naylor plan, if anything? Well, I think that that's a good question for the City Council, but I know that the two guiding factors the City Council were looking at when making their decision to adopt the plan was honoring the one-man, one-vote principle, as it was referred to at trial by the City Council President, and the lease change. And the record on page 2277, and this is the preclearance submission to the DOJ from the City of Hattiesburg, contains a chart which actually shows the deviations that would occur in not only the total persons changing per ward, but the number of voting precincts impacted, and whether or not there was a negative impact to a historical district. The plan that was adopted resulted in six voting precincts impacted, the fewest of any plan that was offered, and 3,552 persons changing wards. Mr. Naylor's plan, there were alternate versions of it, but the one ultimately presented to the Council was almost 9,000 people. The CPAC plan, the total persons changing wards would have been above 12,000. One-third of the voting population inside the City of Hattiesburg. And I apologize, I keep saying University of Mississippi, it's University of Southern Mississippi. University of Southern Mississippi. Go ahead, I'm sorry. And that was one of the concerns. Of course, that was a principle issue in the earlier Fairleigh case that the City of Hattiesburg was here arguing several years ago. So the problems with the Naylor plan and with the CPAC plan, as viewed by a majority of the City Council, was that it would violate traditional redistricting principles. The City, excuse me, the District Court, in using this Court's guidance, was trying to be very careful to determine whether or not a Section 2 violation occurred, not which plan was the best plan. Well, and that's a fair point, too, but if we've previously said don't split up the University of Southern Mississippi, and then Naylor's plan does split up the University of Southern Mississippi, then is it fair to criticize the District Court for not, basically, for following our prior guidance on that? I don't think it's fair, and I'm certainly not trying to offer any criticism of the District Court. We're asking this Court to affirm the District Court. Yes, I know that. So there have been several questions this morning about some of the other plans, and that is one of the things I want to talk about, this idea of maximizing the majority, excuse me, the minority vote. Let me ask you a question just before you get that. I mean, looking at them and how they're laid out, sometimes in these cases there's sort of some either natural barriers or, you know, physically or maybe like that, you know, sort of preclude doing maybe what conceptually she'd done because you just, you got a river here or you got something else. In this case, in this map, there didn't at least appear to be any kind of extrinsic, you know, barriers per se. So are we looking at just a typical subdivision, population layout, sort of where people lay more or less, where people live more or less, not, you know, well, we've got to, you know, pull the river out the middle, et cetera. Is that basically it so when these experts start looking at the layout of where people live, they're not having to factor out, you know, some barrier in the middle. It just looks like a layout in the city. You said the major difference, eight years, is just, well, I guess population growth is what you're saying. Is that right? That's the principal factual change between this case and the earlier Fairleigh case. Yes, Your Honor. So in that eight years, where in this map was that major growth in population? I guess this is where I'm trying to get a handle on it. Well, the growth population did occur mostly inside the minority population of the city and there was a decrease in the number of white voters in the city. So when the, and I think Your Honor's right, some of the principles that the experts do want to honor do involve traditional boundaries of traditional historical districts, train tracks and things like that, Your Honor used the example of rivers, but another one is not disrupting voters and another one is keeping incumbents in their own wards. The first CPAC plan that was proposed to the city council had an error in it in that it had one of the incumbents would have been written out of her own ward and had that plan been adopted, she wouldn't have been able to run for re-election. So that was obviously something that not only the experts for the city of Hattiesburg wanted to make sure was honored, but the plaintiffs did as well when they realized that they wanted that corrected. So preserving communities of interest, not only in historic neighborhoods, but also people know where they're going to vote on election day. They know where their precincts are going to be. They know which ward they live in. There's going to be some shift, obviously. And I'm just wondering in terms of communities of interest when we're talking about a city versus Congress, for example, the United States Congress, there's a lot less regional, there's certainly regional interest in Congress. I'm not doubting that. But the city council is inherently regional. The barn down the street from my house that I'm tired of looking at that's an eyesore, that's really, really local. And I want to be sure my city councilman understands about the barn, so I don't want him living,  Does that, so does the fact that it's a city alter the calculus a little bit versus Congress or some other group where, you know, your street is sort of less relevant? Well, I would agree with your honor that the communities of interest within a city probably do carry a little bit more significance within the context of a city council. For example, one of the areas of testimony was concerning, and this goes to the responsiveness factor underneath the Senate factors, whether or not the Twin Forks project, which is located in a minority part of the city, whether that project had been given responsive to the same level of attention, the same level of tax dollars. How many of the city council votes actually fall on racial lines, three to two? Well, the plaintiffs brought in a stack of city minutes this big. The district court analyzed four years of those minutes and found that out of 205 votes, five of them, five, came down racial lines, and, or excuse me, five of them were three to two. And of those five, only four came down racial lines. That's 2% of the 205, 207 votes. So I think that the communities of interest is important to make sure that their elected board representative is going to represent their interests. I see them. I'm going to give you two minutes on the clock. My question took you off from where you were headed, and then I don't think you ever got back. So there it is. You got two on the clock to make whatever the point, where you were headed, and I will balance it out in the end if you need the two minutes on the other side. Thank you, Judge Stewart. The case . . . When I was . . . excuse me. I didn't mean to interrupt you. No, no. I was just saying there's a lot going on here, and we need to have a good grip on it. So go ahead. I appreciate the court's consideration. The direction I was headed at the time Your Honor asked that question was to talk about this idea from Thornburg v. Jingles that there has to be an intensely local appraisal of the facts. And again, this court in the Gonzales v. Harris County also said that you have to look at the local facts. This is something where you have got to show a practical evaluation of past and present reality has been conducted. And so, and I don't want to take you further off track, but I think this is on that track. When we were talking earlier when Judge Stewart was asking about is this really kind of the facts are sort of undisputed, so kind of this is more legal. When we're talking about a district judge who lives in Hattiesburg, or at least works in Hattiesburg, and therefore is much more aware of the intensely local aspect, should we be more deferential to that even if there's not a whole lot of disputed facts when we're talking about, like if we see the totality a little differently than the judge on the ground? Should we defer to the judge on the ground because of the intensely local nature, or is it really more of a legal point once there's not a lot of disputed facts? I think the deference given to the judge on the ground should really be bound to the record that was presented and for the intensely local examination and appraisal that was conducted by expert witnesses, as well as the lay witnesses themselves and presented to the judge. Of course, the fact that the judge lives there may make him a little more well-connected in his understanding of things, but I believe the district court issued its opinion purely based on the relevant evidence as it was presented. The exogenous elections, and I want to say this quickly and then I'll sit down because Judge Haynes, you asked a question about this earlier, I want to make sure it's known that the plaintiff's own expert who submitted three expert witness reports, two of which were from the earlier case, he resubmitted them, and only one second supplemental report, he himself relied on, quote-unquote, exogenous elections, one not involving the seated issue, and that exogenous election was the mayoral election that Your Honor was asking counsel opposite about. My time has expired now, and we would ask this Court affirm. Thank you very much, Your Honors. All right, Mr. Mills. I move rather slowly, but it's caught up with me. The one thing that I do think is really important in this case is the comment that counsel opposite made early on about the difficulty of, or the rare case where the jingles preconditions are met and there's no Section 2 violation. In the recent Veazey case, this Court recognized that the Supreme Court had rendered Shelby v. Holder, Shelby County v. Holder, and that in that case, the Court recognized in a Section 5 context that you need to go with more recent relevant history. You don't really need to go back to the Civil War, as this Court put it. Here, things have changed since 1994. You don't have to go back to the Civil War to still find discriminatory evidences either. You can watch the Transylvania, Transatlantic slave trade, but one doesn't need to act like you've got to really go that far back to find issues either. Judge, when we first tried this case that came to this Court some seven or eight years ago, Mr. Clarence McGee was testifying . . . Let me stop you, because the clock is going to run, and I know those points, but let me just ask you, looking at this, sometimes we get these cases, it looks like there just is no solution. They've just got to be teed up and so forth. I declare when I looked at the way these are lined up in the population, it looked facially like there was a solution here somewhere in terms of mapping this out. Some of these just look . . . there's no way. It just can't happen, either because of barriers, extrinsic, et cetera, geographic, but with the population growth, it looked with all that, somewhere within there where there was a hybrid of one of these many plants, it looked like there was some solution there. I don't mean to oversimplify what you all have spent lots of time in, but it looked somewhere there, and that's why I was interested in the question. The answer, though, in terms of the eight years of population growth, whether that eight years was occurring in each one of these five, or whether it was occurring in one particular area that was sort of skewing things, do you understand what I'm asking? Whether the growth occurred throughout the five, so even without it, you kind of still get that same thing, or whether the growth was in a particular area that made this sort of insoluble. I think the record will show that the largest African-American growth occurred in South Hattiesburg. I believe it's Ward 5. It'll be 5? Yes, in Mrs. Mailer's ward. And was it in a relatively compact area that's harder to divide up? Is that the problem? Yes, it was. Ward 5 is large geographically because it had to be, at the time it was created, to get an African-American majority ward with the numbers that the community demanded at that time. But, as I said, going back to history, I'm going to be very brief. The history that was put on in Farrelly 1, one of the plaintiffs was testifying. I felt compelled to apologize to him for what he had been through because it was overtly racist, no question about it. But since that time, that overt racism is no longer there. There's no longer official discrimination. The trial court said that had long ago ceased. There was an indication that African-Americans had overcome the socioeconomic factors which had prevented them from participating in elections. In fact, the testimony was that black voter turnout and registration exceeded that of African-Americans. There. So what relevance does any of this have to our consideration here, beyond obviously it's a factor and we have the factors? What are you trying to say that this changes about the discussion we've had today? Do you believe that as you recognize the significance of Shelby County v. Holder in the Veazie case, I do believe that it applies to this case as well? Well, I mean, the interesting thing to me is this passed preclearance and that one didn't back when we had preclearance. I guess we shouldn't care because preclearance is gone, but does it matter? Does that alter the analysis? The fact that you have a pretty active Department of Justice cutting down a lot of different rules under preclearance didn't cut this one down. You asked a question at the commencement of this hearing about what should you do so that you know about what you ought to be looking at when you're going into one of these cases. We obviously, goal one, we're looking to get precleared. That was done and then the only other instruction that was given to the consultants was to use traditional redistricting principles. I don't know if any of you, and we didn't cite it in the brief, but the very recent case striking down the North Carolina voter ID, or redistricting rather, noted that in that case there was a predetermination that the maximum number of African American voting districts possible should be formed so the proportionality requirement would be made. There the court held it to be racial gerrymandering. We went in with no preconceived racial determination. The evidence does reflect, however, that the objectors throughout sought a predetermined racial determination. I apologize for going over, but thank you very much. I appreciate your argument. Thank you. All right. Ms. Archer, we're back to you. I'll give you the two minutes additional. I'll go to the other side if you need it. I just have a few points I'd like to address. First to begin with, that the history that opposing counsel spoke of and that racism is no longer a part of Hattiesburg. Just to point out, the public schools in Hattiesburg are 90% black and they're still under a court order to desegregate. The expert witness on behalf of the plaintiffs and the district court discussed the extreme and deep socioeconomic disparities that exist between the black community and the white community in education, in employment, in housing. The district court itself speaks of white neighborhoods and black neighborhoods. To say that racism, whether it's de facto or de jure, is no longer a part of the Hattiesburg is not an accurate statement. Do you agree with the response given to me in terms of this eight years' worth of growth that pretty much occurred down here in five as opposed to, you know, all these areas? I'm actually not 100% clear on where exactly all of the growth happened, but I do think it's important, particularly in light of opposing counsel saying that we are seeking to maximize black districts. In fact, what we would like is a fair district, and I think a fair districting plan would recognize the incredible growth in the black population. We haven't clearly articulated it, but between 1980 and 2010, the black population grew by 74% while the white population declined by 28%. In order to accomplish- I think the point is that sometimes that happens by moving around, people moving in, people moving out. And sometimes it happens by there's just people having babies and relatives moving in, say, with people and so on. So where that would be growth, let's just take my block, if the person next door has five babies, the population has grown, but we're all in the same place, versus five different people moved in and out and so on. And I think that was the point that was being made, is what are we talking about, the kind of growth that maybe keeps neighborhoods- the growth is happening sort of within the block or the growth is just all over the place, people moving across town and people coming in, people moving out, and all of that. Well, wherever the growth is happening first, it's important to craft a plan that recognizes that growth. And the way that they responded to the growth here was to pack the black community into two districts. It's about 75%, which is extreme packing, I think, on any measure to have- But that's true if, in fact, you've- I've seen these kinds of maps where they went over here to grab this street and pulled it over, but where the segregation, if you will, is just the nature of where people live, I think it's harder to accuse the council of the packing. There may be packing, but it may just be the nature of Hattiesburg. And that may be remnants or part of the segregation you spoke of earlier, I'm not saying it happened for a good reason, but nonetheless, you have the problem of the breaking up of communities of interest and all of that, that I still think matters, regardless of all of the other considerations. Well, absolutely. Respecting traditional redistricting principles is important. Also making sure that there isn't vote dilution and that there's equal opportunity is also important. And here, I think it's important to separate two questions. And one is a question of liability and whether or not the plan that was ultimately adopted violates Section 2. And the second is a question of remedy and whether or not any of the plans that the plaintiffs proposed or the illustrative plans are appropriate remedies, whether or not a plan that provides an opportunity district is an appropriate remedy, or whether there's some other remedy altogether. The district court didn't make findings on appropriate plans on whether or not it was possible to... What do you do with the argument that if we basically tell the city council they have to, you know, if it's 40%, 7% voting age, you have to... What do you do with the argument that that then becomes racial gerrymandering, kind of in the other direction? Where's that balance? Because, again, I want to be sure whatever we do, it gives guidance for people who are acting honorably. Of course, there's always going to be people who act dishonorably. I don't know that that happened here by anyone. But I'm simply saying, how do we give guidance that avoids overt racial gerrymandering in an inappropriate fashion, respects community interests, and makes sure that there's this equal opportunity that's so important? Talk to me about that. I think the courts have given that guidance when they've said, and the Supreme Court has said, that the proportionality factor can never itself be dispositive. And we're not arguing here that proportionality should be dispositive, that the 60-40 split is what this court should make its decision on. We are arguing that there are many factors that the Supreme Court has said that we need to consider. And when you consider all of the factors, it demonstrates vote dilution, not that proportionality is standing on its own. Although we do believe that factor weighs in our favor, we do not argue that proportionality standing on its own should ever be the decisive factor. And ... Sir, cutting somewhat to the chase, it's an argument that given the factors that the district court found in favor of the plaintiff, and the mapping that the district court came out with at the wrong end of that, is that ... First of all, is that the question? Well, I know that's not all the question, but I'm trying to get at it. Is part of relief, see it here, a redo of all this that's there? Is it a pronouncement that even with the facts, you can't find two and seven in our favor, da-da-da-da-da-da? If you find out this is not one of the exceptional cases, based on what you found, you've got to be here. Or is it all above or whatever? Just help me. I'm trying to ... Ultimately, Your Honors, we're asking that the court enter judgment in favor of the plaintiffs and remand for appropriate remedy. And we do believe that even if you take the facts as the district court has found them, that what must happen is a finding that the plan violates Section 200 of the Totality of the Circumstances Analysis. And again, putting the jingles factors aside, which the defendants conceded, we've established racially polarized voting. If you take that as true, then which of these plans that were down there, despite what they vote ... Well, if we take as true that we've established liability, that we've established a violation of Section 2 ... Which of the plans is there? I think that that's something that needs to be determined at the district court level. It needs to be remanded to the district court for identification of an appropriate remedy. That's why part of what you're singing is a do-over.  Well, it wouldn't be a do-over. I'm just trying to walk through whether it's a do-over, saying, okay, you found this, you found this. Do-over. Same people, same map, same experts, trying to visualize like, well, Judge Starrett says, here we are again, gathered together with all our maps and so forth. I'm not trying to be facetious at all, but I'm trying to just factor in my head, other than the Fifth Circuit, three people said, do something. I'm trying to visualize what that is. Is it more experts? Is there another plan conceived within the numbers, or is it just coming to a different conclusion that, in effect, would be asking us to exercise our plenary authority and say, X is the answer? I know that's kind of convoluted, but I'm trying to, as I want to know from each side, like, what's the deal? My time is up. May I have a moment to respond? Time never runs on the Court's questions, you know? So we're not asking for a do-over. We don't believe that the District Court engaged any fact-finding on what an appropriate plan would be if there was a violation of Section 2. So if this Court was to find a violation of Section 2, it would be remanded to the District Court for a fresh evaluation. It hasn't happened. There was no fact-finding on what an appropriate plan was, what all the alternatives are. So should this be remanded, that is something that would happen in the District Court. And what's the, I'm not sure if you addressed it, what's the impact, if any, on us of the prior Fairley case that was up? What if any, I know we have all read it and it's there, what impact, I mean, I'm not sure if I asked you that on the record.  There's nothing in the first failure that binds this Court, as opposing counsel mentioned, when you're looking at Section 2, you're required to take a holistic look of the facts on the ground at that time. And the facts are very different now than they were then. As we've discussed in Fairley 1, the black people were less than 50% of the population. They were about 40% of the voting age population. And today, they're a majority of the population and a plurality of the voting age population. So this Court would need to take a look at the facts, given the changes since the Court heard Fairley 1. Did you have another question? Ms. Archer, what's the present status of the federal indictment against Reverend Fairley? Your Honor, I don't know the answer to that question, but we are happy to look into it and provide you with a response. Thank you. Are there no further questions? We'll rest on our briefs. Thank you. All right. Thank you, counsel, both sides. We will immerse ourselves in it and come out with an answer at some point. But before we do, and before we shift to SEC v. Valdez, we'll take a real short recess and come right back.